Mark Jaffe (California Bar No. 315950)
5 Bridges Law, PC
2027 Ascot Drive #1
Moraga, CA 94556
t:  (718) 730-3306
markj@5bridgeslaw.com

*Attorney for Plaintiff Sarah Ruba*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**

| | |
|---|---|
| SARAH RUBA<br><br>                    Plaintiff,<br><br>          v.<br><br>DAVID TAYLOR; DIARY PRODUCTIONS, INC. f/k/a DIARY RECORDS, INC.; DIARY PUBLISHING, INC.; DIARY MUSIC PUBLISHING, INC. | **Case No.**<br><br>**COMPLAINT**<br><br>**JURY TRIAL REQUESTED** |

Plaintiff Sarah Ruba alleges against Defendants:

## Introduction

1.      Plaintiff Sarah Ruba is a celebrated songwriter and producer who was duped by her soon-to-be ex-husband David Taylor into signing her rights away to his shell companies, Diary Publishing, Diary Music Publishing, and Diary Records.

2.      The companies served no purpose except to divert royalties owed to Ms. Ruba and to enrich Mr. Taylor personally.

3.      Although these contracts obligated the companies to pay these royalties to Ms. Ruba, none were paid.

1

COMPLAINT

4. Instead, Mr. Taylor collected the royalties, kept them in his pocket, and funded his personal expenses with the companies' money.

5. The companies did not follow any corporate formalities, and fulfilled none of their contractual obligations.

6. The Diary companies existed only as vehicles to cheat Ms. Ruba out of payments she could have collected on her own, and to keep her locked into a failed business relationship.

7. In fact, the "publishing company" Mr. Taylor used to contract with Ms. Ruba did not exist at the time Mr. Taylor induced Ms. Ruba to enter into a publishing agreement, and was non-existent until he filed Articles of Incorporation with the Secretary of State of California - for a different company - more than a year a later.

8. The companies serve no corporate purpose and should not be recognized. Ms. Ruba asks this court to ignore the façade of Mr. Taylor's corporate form, just as he did.

9. She is entitled to her royalty payments directly from Mr. Taylor, a judgment releasing her from all obligations to the Diary companies, and compensatory damages for lost profits and opportunities.

10. The Diary companies and Mr. Taylor owe Ms. Ruba more than $200,000 in unpaid royalties.

### The Parties

11. Plaintiff Sarah Ruba is a resident of Ontario, Canada.

12. Defendant David Taylor, professionally known as "Switch", is a resident of Los Angeles, California.

13. Ms. Ruba and Mr. Taylor are married, and are undergoing divorce proceedings in Superior Court of California, County of Los Angeles.

2

COMPLAINT

14. Defendant Diary Music Publishing, Inc. is a California corporation with a principal place of business in California. [1] Upon information and belief, Mr. Taylor is its CEO and sole owner.

15. Defendant Diary Productions, Inc., f/k/a Diary Records, Inc., is a California corporation with a principal place of business in California. [2] Upon information and belief, Mr. Taylor is its CEO and sole owner.

16. It is unclear if defendant Diary Publishing exists. As explained further below, this company purported to sign a contract with Plaintiff Sarah Ruba, but there is no record of a company called Diary Publishing formed in New York, California, or Delaware.

17. Without waiving her allegation that the corporate form of Diary Publishing should be disregarded, to the extent that is recognized, Mr. Taylor is, upon information and belief, its CEO and sole owner. To the extent that its corporate form is recognized, its principal place of business is in California.

## JURISDICTION AND VENUE

18. There is subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiff resides in Canada, and each of the Defendants are domiciled in California, and the amount in controversy exceeds $75,000.

19. This Court has personal jurisdiction over each of the Defendants because they reside in California.

20. Venue is proper in the Central District of California under 28 U.S.C. §§ 1391(b) because the Defendants reside and conduct business in this judicial district and a substantial part of the events giving rise to the claims occurred in this judicial district.

---

[1] The corporation search under the California Secretary of State reveals a principal address at 420 Lexington Ave., Suite 1756, New York, NY 10170.

[2] The corporation search under the California Secretary of State reveals a principal address at 420 Lexington Ave., Suite 1756, New York, NY 10170

3

COMPLAINT

21.     Additionally, both contracts material to this dispute require that litigation be brought in a court in Los Angeles, California.

22.     A corporation search through the California Secretary of State reflects a Principal Address at 420 Lexington Ave., Suite 1756, New York, NY for both Diary Records Inc. and Diary Publishing, Inc.

23.     Nevertheless, all of the above, together the facts alleged in this Complaint, establishes that both personal jurisdiction and venue is proper in the Central District of California.

24.     If it is determined that any of the Defendants are domiciled in New York, subject matter jurisdiction is still proper under 28 U.S.C. § 1332 because there is complete diversity between the parties.

## FACTS

### Sarah Ruba, David Taylor, and the Diary Companies

25.     Sarah Ruba is a songwriter, singer, musician, and model. She performed with the critically acclaimed indie synth-pop duo New Look from 2008 through 2013, worked as a songwriter on the Netflix series The Get Down, and wrote and produced songs on Chaka Khan's album Hello Happiness.

26.     Sarah Ruba and Dave Taylor met in 2013 when Mr. Taylor was managed by RocNation, which also managed New Look, a group fronted by Ms. Ruba.

27.     They married on May 2, 2018.

28.     For years, Mr. Taylor promised Ms. Ruba that he would advance her career, and assured her that if she signed contracts with him she could release albums on a major record label.

29.     In or around 2017, Mr. Taylor discussed with Ms. Ruba a plan to form and operate two companies: a publishing company to further their songwriting careers, and a recording company to further their recording careers.

30.     Mr. Taylor proposed that he and Ms. Ruba control and operate these companies together.

4

COMPLAINT

31. Mr. Taylor assured Ms. Ruba that she would be paid royalties from these companies, just as she would with any third-party publisher or record label.

32. Mr. Taylor engaged the services of Sharen Norden, a manager, to assist with these companies.

33. However, Ms. Norden was paid as an independent contractor and was given no title in any companies, nor was there any agreement that she had authority to bind them.

34. On or about October 28, 2017, Ms. Ruba and Mr. Taylor signed a contract with Diary Records ("Diary Records Contract").

35. The Diary Records Contract stated that Ms. Ruba and Mr. Taylor are "professionally known together as 'Sarah Ruba'" and are "jointly and individually referred to in this agreement as 'the Artist'". *See contract dated October 28, 2017, Exhibit A*

36. Ms. Ruba signed to Diary Records because it signed a contract with Island Records UK.

37. The expectation was that her projects would be "upstreamed" by Island Records and that Ms. Ruba's career would prosper from it.

38. Ms. Norden, who had no title at Diary Records, was asked to sign the Diary Records Contract on behalf of Diary Records. *Exhibit A p. 29*

39. The Diary Records Contract required the "Artist" to record new and original recordings and deliver them to Diary Records. *Exhibit A ⟍ 3.1*

40. The Diary Records Contract required Diary Records to pay Ms. Ruba a $12,500 advance upon signing the contract. *Exhibit A ⟍ 7.1.1*.

41. Under the Diary Records Contract, parties agree to pay all damages and costs, including legal fees, for any "adjudicated claim" over breaches of the agreement. *Exhibit A ⟍ 17.2*

42. The Diary Records Contract did not contain a "merger" clause.

5

43. The Diary Records Contract requires that any action arising from the agreement be brought in the "County of Los Angeles, or in a federal district court for the Central District of California in Los Angeles, California." *Exhibit A ℗ 29.6*

44. A short-form version of a publishing contract titled COMPOSER ASSIGNMENT OF COPYRIGHT was signed by Ms. Ruba on or around October 30, 2017 ("Diary Publishing Contract"). *See COMPOSER ASSIGNMENT OF COPYRIGHT, Exhibit B.*

45. Ms. Ruba did not have independent counsel before signing the Diary Publishing Contract.

46. Mr. Taylor assured her that it was in her best interest to sign.

47. The Diary Publishing Contract included a 5-year Term and 25-year Rights Period where Diary Publishing would own the rights to every song written during the term.

48. After the 25-year period, the contract provides that Ms. Ruba is entitled to reassignment of the copyrights and all accompanying licenses. *Exhibit B, ℗ 1.*

49. The Diary Publishing Contract required Diary Publishing to collect and receive all income, royalties and fees from the compositions worldwide. *Exhibit B ℗ 2*

50. The Diary Publishing Contract required Diary Publishing to account and pay to Ms. Ruba (*Exhibit B ℗ 3*):

    a. 10% of retail selling price for sheet music. *Exhibit B ℗ 3.1*

    b. 75% of Publisher's Royalty Receipts for mechanical reproduction of records (commonly known as "mechanicals"). *Exhibit B ℗ 3.2*

    c. 75% of Publisher's Royalty Receipts for uses in televisions, films, and commercials (commonly known as "sync licenses"). *Exhibit B ℗ 3.2*

    d. 50% of Publisher's Royalty Receipts as relating to "publisher's share" of performing fees worldwide (Ms. Ruba's author share of performance

6

COMPLAINT

royalties would be paid directly by the performance rights organizations. *Exhibit B ⁋ 3.6). Exhibit B 3.3.* [3]

51. Under the Diary Publishing Contract, Diary Publishing is required to pay these royalties within days of June 30 and December 31, with a reasonably detailed accounting.

52. The Diary Publishing Contract requires that the contract is governed by California law and that "the exclusive jurisdiction of the federal courts located in the State [of California] for determination of any dispute arising under or in connection with this Agreement." *Exhibit B ⁋ 7.*[4]

53. The Diary Publishing Contract provided that the parties would subsequently enter into a Long Form Agreement. *Exhibit B ⁋ 8.*

54. There was never a Long Form Agreement.

55. The Diary Publishing Contract did not contain a "merger" clause.

56. Prior to the agreement with Chaka Khan detailed below, Ms. Ruba wrote songs that, if Diary Publishing or the Diary Publishing Contract were valid, would be the property of Diary Publishing.

57. Ms. Norden, who had no title at Diary Publishing, signed on behalf of Diary Publishing.

58. It is unclear if Norden had any authority to bind any of the Diary companies.

59. Upon information and belief, all or almost all of Diary Publishing's revenue derives from Ms. Ruba's compositions.

---

[3] Several places in the contract, including this subsection, refer to a non-existent "sub-clause 2.3". It is likely that this is meant to refer to subsection 3.3.

[4] Plaintiff acknowledges that a contract cannot create federal jurisdiction where there otherwise would be none. There is diversity of parties under 28 U.S.C. § 1332.

COMPLAINT

60. Each Diary contract lists the company address as "c/o Tribeca Business Management, 420 Lexington Business Management, 420 Lexington Avenue, Suite 1756, New York, New York". *Exhibit A p. 1; Exhibit B p. 2*.

61. At the time the Diary Publishing contract was signed, there was no entity formed in any state named Diary Publishing.

62. Mr. Taylor never registered the company Diary Publishing in any state.

63. Having failed to have Diary Publishing recognized under the laws of any state, Mr. Taylor has not performed any corporate formalities required for a corporation to have a separate existence from its owner.

64. Mr. Taylor awarded himself sole control over Diary Records and the unformed Diary Publishing. He had sole control of the companies' operations and bank accounts.

65. A thorough search of the New York State Corporation and Business Entity Database and California Secretary of State revealed no companies called "Diary Publishing".

66. On January 8, 2019, Diary Music Publishing, Inc. filed its Articles of Incorporation with the Secretary of State of California. It lists a business address at 420 Lexington Avenue, Suite 1756, New York, NY, and a mailing address at 4640 Admiralty Way, Suite 500, Marina del Ray, CA. *Exhibit C*.

67. Diary Music Publishing was formed more than a year after Mr. Taylor induced Ms. Ruba to sign a contract with "Diary Publishing".

68. The By-laws Statement of Incorporation of Diary Music Publishing, Inc. lists its incorporation date as January 8, 2019. It lists David Taylor as the sole member of its Board of Directors. *Exhibit D*.

69. The By-laws require, among other things, that shareholders are required to hold an annual meeting on January 8 each year, as required under California Corporations Code.

8

70.     Upon information and belief, Diary Music Publishing has not fulfilled the corporate formalities under its By-laws and California Corporations Code.

71.     On February 19, 2020, Diary Records filed with the Secretary of State of California to change its corporate name to Diary Productions, Inc. *Exhibits E*.

### Island Contract

72.     For years, Ms. Ruba worked behind the shadow of "Switch", writing and recording music with the expectation that Mr. Taylor would obtain deals on her behalf and pay royalties required under the Diary contracts.

73.     Ms. Ruba and Mr. Taylor showcased Ms. Ruba's demos to Island Records, including her solo material and their project Wayward Girl. Island Records offered Diary Records a contract, with the expectation that Diary Records would deliver masters to Island Records so that Island Records can turn her records into hits.

74.     Diary Records, Inc. signed its contract ("Island Records Contract") with Island Records on or about October 17, 2017. *Exhibit F*.

75.     The Island Records Contract required Mr. Taylor to be "primarily responsible" for Diary Records' obligations and that he ensure it "carry on the business of a record company and shall act in their best business judgment with all due care and skill in relation to the business of" Diary Records. *Exhibit F, ¶¶ 1.2, 1.3*.

76.     Mr. Taylor independently signed an agreement with Island Records to carry on the business of a record company. *Exhibit F, Schedule A*.

77.     In the Island Records Contract, Diary Records acknowledged it would enter into agreements with three artists: Chaka Khan, Wayward Girl and Sarah R. The contract required Diary Records to provide Universal with these agreements. *Exhibit F, ¶ 5.6*.

78.     Wayward Girl is a joint project of Ms. Ruba and Mr. Taylor.

79.     Upon and information and belief, "Sarah R" means Sarah Ruba.

80.     The Island Records Contract required that its parent company Universal Music Operations ("UMO") would pay 100% of the minimum statutory rate to license

COMPLAINT

each of the compositions for recordings under the agreement, including 100% of the minimum statutory rate for "Controlled Compositions." *Exhibit F, ℙ 17.2.1.*

81. Island Records agreed to pay Diary Records an "Overhead Funding" of 250,000 pounds and "A&R Funding" of 450,000 pounds to make albums by the three artists. *Exhibit F, ℙ 7.1.2.*

82. Island Records also agreed to retain the Producer services of David Taylor only, at a 4% royalty rate. Exhibit F, ℙ 11.

83. Diary Records granted Island Records an exclusive license for the Term.

### Chaka Khan Contract

84. The legendary singer Chaka Khan (the professional name of Yvette Marie Stevens) signed a recording contract with Diary Records on or around Feb. 23, 2018 (The "Chaka Khan contract"). *Exhibit G.*

85. Under the Chaka Khan Contract, Diary Records paid her a $62,500 advance upon signing, and an additional $12,500 advance on the completion of the first album. *Exhibit G, 7.1.*

86. Chaka Khan's recording of "Like Sugar" was recorded on or around January 16 2017, and released to the public on or around June 15, 2018.

87. Chaka Khan's album Hello Happiness, consisting of seven songs co-written by Ms. Ruba, was released to the public on February 15, 2019.

88. "Like Sugar" was a hit in the United States and the United Kingdom, attracting proposals for sync licenses worldwide.

89. Songs from Hello Happiness have been streamed more than 45 million times on Spotify. "Like Sugar" has over 36 million streams.

90. "Like Sugar" has over 35 million streams on YouTube.

10

COMPLAINT

**Contract Breaches**

91.   Ms. Ruba co-wrote seven songs for the album Hello Happiness, recorded by Chaka Khan.

92.   Under "split sheet" agreements with co-writers, Ms. Ruba was allocated the following percentage of authorship in the compositions:

    a.  "Too Hot":              27%

    b.  "Like Sugar":        13.32%

    c.  "Like a Lady":      20%

    d.  "Don't Cha Know":   25%

    e.  "Isn't That Enough":  40%

    f.  "Ladylike":          22.5%

    g.  "Hello Happiness":  30%

93.   To date, Ms. Ruba has received none of the money entitled to her under the Diary Publishing Contract for these compositions.

94.   None of the following have paid her a single cent for her songwriting: Diary Publishing, Diary Music Publishing, Diary Productions f/k/a Diary Records, or Mr. Taylor.

95.   ASCAP collects and distributes royalties for public performances of musical works, or compositions. It distributes half of the proceeds directly to songwriters (the "authors' share") and half to publishers or copyright owners (the "publishing share").

96.   Under the Diary Publishing agreement, the company is obligated to pay 50% of this publishing share of U.S. public performance royalties to Ms. Ruba.

97.   Ms. Ruba has received her proper author's share of each of these compositions from ASCAP, the American performing rights organization ("PRO"), because the author share is paid directly to her by the PRO. Her share for each of these compositions corresponds with the "splits" listed above.

11

COMPLAINT

98.    ASCAP's database reveals that Diary Music Publishing is among the publishers paid by ASCAP for songs co-written by Ms. Ruba for Hello Happiness.

99.    Diary Music Publishing has not paid Ms. Ruba any of the money required under the Diary Publishing requirement for the royalties collected by ASCAP.

100.    Nor has Diary Music Publishing paid Ms. Ruba for any publishing shares from each of the performing rights organizations worldwide.

101.    The composition "Like Sugar", for which Ms. Ruba holds a 13.32% authorship interest, has been given sync licenses and has been performed on television programs, commercials, and video games worldwide, for Mitsubishi Australia, Virgin Atlantic UK, Target, Law and Order, the Ellen DeGeneres show, and Charlies Angels.

102.    Based on an accounting of known revenue from sync licensing, generated by Ms. Ruba and not provided by Defendants, Mr. Taylor owes Ms. Ruba at least $180,000 just from unpaid royalties on sync licensing through the March 2021.

103.    The total amount of sync licensing owed to Ms. Ruba exceeds $200,000.

104.    Based on Ms. Ruba's authorship share of public performance royalties from ASCAP, Mr. Taylor owes Ms. Ruba at least $15,500 in the publishing share of public performance royalties in the United States alone. Additional amounts are owed for Ms. Ruba's share of foreign public performance royalties.

105.    Mr. Taylor owes Ms. Ruba unpaid mechanical royalties, in an amount that cannot be determined due to Defendants' failure to provide an accounting as required under the Diary Publishing Agreement.

106.    Ms. Ruba sent demands to Mr. Taylor numerous times for an accounting as required under the Publishing contract. Mr. Taylor has not submitted a single payment.

107.    Diary Music Publishing's Profit and Loss statements, obtained in the divorce proceedings, reveal that it received licensing income.

12

COMPLAINT

108. These Profit and Loss statements also reveal deductions by Diary Music Publishing that cannot be deducted from Ms. Ruba's share under the Diary Music Publishing Contract.

109. The Profit and Loss statements reveal payments directly from Diary Music Publishing to Diary Records.

110. Diary Records, in turn, paid Mr. Taylor through his wholly owned limited liability company Werd LLC.

111. Upon information and belief, Mr. Taylor has used the money collected by Diary Music Publishing for his own personal benefit, for projects and items unrelated to the business of a music publisher.

112. By failing to form the corporate entity named in the Diary Publishing Contract, failing to observe any corporate formalities, failing to fulfill any of his obligations under the Diary Publishing Contract, and using funds for his own personal benefit that should have been remitted to Ms. Ruba, Mr. Taylor has lost any benefits of the corporate form and limited liability.

113. Diary Music Publishing's functions, if at all, to divert money rightfully belonging to Ms. Ruba directly into Mr. Taylor's own personal interests.

114. Additionally, Mr. Taylor failed in his obligations to market and promote new opportunities for Ms. Ruba.

115. Diary Publishing provided no opportunities for Ms. Ruba to write songs for any other artists, and did not include Ms. Ruba in any songwriting sessions he participated in during the publishing term.

116. After March 2020, Diary Publishing ceased all communications with Ms. Ruba.

117. Had Diary Publishing acted proactively on Ms. Ruba's behalf, or Ms. Ruba been free to write songs outside the scope of the Diary Publishing Agreement, Ms. Ruba would have made additional income.

13

COMPLAINT

118.   Moreover, Mr. Taylor did not fulfill his obligations to Island, which ultimately led to Island's termination of its agreement.

119.   Chaka Khan album's release was pushed back several times due to Mr. Taylor's failure to produce master recordings under the Island Contract.

120.   Moreover, Mr. Taylor did not put time into master delivery for the Sarah Ruba or Wayward Girl albums, which were necessary to fulfill their obligations under the Island Contract and for Ms. Ruba to be funded under the contract.

121.   As a result, Island Records lost interest in Diary Records because of Mr. Taylor's failure to produce music.

122.   On or about June 11, 2019, Island sent notice to Diary Records that it opted to terminate the Term of the Agreement under Clause 3 of the Agreement.

123.   Since that day, Mr. Taylor and Diary Records have made no attempts to secure another record deal for Ms. Ruba or any of her projects.

124.   As a result of Island's termination of its agreement with Diary Records, Ms. Ruba remains bound to a contract that serves no purpose, with a company led by a man who is cheating her out of funds lawfully due to her.

125.   Diary Records did not pay Ms. Ruba the $12,500 advance required upon signing the agreement, even though Island Records paid advances to Diary Records.

126.   Ms. Ruba and Mr. Taylor commenced divorce proceedings in the Superior Court of California, County of Los Angeles on May 11th, 2020.

127.   Numerous times during the divorce proceedings, Ms. Ruba's divorce lawyer sought to obtain an accounting from Mr. Taylor of all royalties paid and due under the Diary contracts.

128.   Mr. Taylor, through his counsel, refused to provide any of this information or to resolve any of these issues as part of the divorce action.

129.   Mr. Taylor indicated, through his attorneys, that these obligations are outside the scope of their marriage and should be litigated or resolved separately from the divorce proceedings

14

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT – DIARY PUBLISHING CONTRACT
### Against Diary Publishing and Diary Music Publishing, Inc.

130.   Plaintiff incorporates the above paragraphs by reference, as though fully set forth herein.

131.   Ms. Ruba entered into a contract with either "Diary Publishing" or Diary Music Publishing, which required payments of royalties to her.

132.   Despite her demands to these companies to pay the past due royalties, none were paid.

133.   A conservative estimate of royalties due to Ms. Ruba for sync licenses through March 2021, based only on the ones that Ms. Ruba is aware of, exceeds $180,000. Upon information and belief, the total owed exceeds $200,000.

134.   At least $15,500 in public performance royalties in the United States is owed to Ms. Ruba.

135.   Additional public performance royalties from international public performance royalties are owed to Ms. Ruba.

136.   Ms. Ruba is also owed payments for mechanical royalties, in an amount that cannot be determined due to Defendants' failure to provide an accounting as required by the Diary Publishing Agreement.

## SECOND CAUSE OF ACTION

### BREACH OF CONTRACT – DIARY PUBLISHING CONTRACT
### PIERCING THE CORPORATE VEIL
### Against David Taylor

137.   Plaintiff incorporates the above paragraphs by reference, as though fully set forth herein.

138.   By failing to form the corporate entity named in the Diary Publishing Contract, failing to observe any corporate formalities, failing to fulfill any of his obligations under the Diary Publishing Contract, and using funds for his own personal

15

COMPLAINT

benefit that should have been designated for Ms. Ruba, Mr. Taylor has forgone the benefit of a separate corporate existence.

139. If the obligations of Diary Publishing or Diary Music Publishing were treated as only those of the company, leaving Mr. Taylor untouched, it would create an inequitable result that would continue to benefit Mr. Taylor personally while leaving Ms. Ruba with nothing. Worse yet, if Ms. Ruba remains bound to the contract, she will lose all her future potential revenue for the benefit of the person who cheated her.

140. As a result of his actions, the corporate form of Diary Publishing and Diary Music Publishing should be disregarded, and Mr. Taylor be held liable for the company's monetary obligations to Ms. Ruba under the Diary Publishing Contract.

141. Moreover, Ms. Ruba should be relieved of any further obligations to Mr. Taylor under the Diary Publishing Agreement.

## THIRD CAUSE OF ACTION

**BREACH OF IMPLIED COVENANT OF
GOOD FAITH AND FAIR DEALING
FAILURE TO USE BEST EFFORTS
DIARY PUBLISHING CONTRACT
Against Diary Publishing, Inc., Diary Music Publishing, Inc.,
and David Taylor**

142. Plaintiffs incorporate the above paragraphs by reference, as though fully set forth herein.

143. In entering the contract, the parties contemplated that the publisher would undertake best efforts to market, monetize, and exploit Ms. Ruba's compositions.

144. The Diary Publishing Contract has an implied promise of good faith and fair dealing.

145. The Diary Publishing Contract has an implied promise to use best efforts to market, monetize, and exploit Ms. Ruba's compositions.

16

COMPLAINT

146. The Diary Publishing Contract stated that a "long form" agreement would be negotiated with the "additional standard terms and provisions customarily contained in agreements of this nature".

147. An obligation to use best efforts is a standard provision in a music publishing agreement.

148. Had the parties negotiated the long-form agreement, there would have been an obligation for the publisher to use its best efforts to market, monetize, and exploit Ms. Ruba's compositions.

149. By failing to use best efforts to exploit the compositions, defendants caused lost profits and lost opportunities to Ms. Ruba.

150. Those lost opportunities include licensing proposals Mr. Taylor and the Diary Defendants failed to pursue.

151. Moreover, by failing to pay Ms. Ruba any of the royalties due under the Diary Publishing Contract, and diverting those funds for Mr. Taylor's own purposes, Ms. Ruba was discouraged from writing new songs to generate more revenue.

## FOURTH CAUSE OF ACTION

### PIERCING THE CORPORATE VEIL – DIARY RECORDS CONTRACT
### Against David Taylor

152. Plaintiff incorporates the above paragraphs by reference, as though fully set forth herein.

153. By failing to observe any corporate formalities, failing to fulfill its obligations under the Diary Records Contract, and using advance funds paid by Island Records for his own personal benefit that should have been used for the benefit of the company and Ms. Ruba as its signed artist, Mr. Taylor has forgone the benefit of a separate corporate existence.

154. If the obligations of Diary Records were treated only as those of the company, leaving Mr. Taylor untouched, it would create an inequitable result that would benefit Mr. Taylor personally while leaving Ms. Ruba with nothing. Worse yet,

if Ms. Ruba remains bound to the Diary Records Contract, she will lose all her future potential revenue for the benefit of the person who cheated her.

155. As a result of his actions, the corporate form of Diary Productions, Inc. f/k/a Diary Records, Inc. should be disregarded, and Mr. Taylor be held liable for its monetary obligations to Ms. Ruba under the Diary Records Contract.

156. Moreover, Ms. Ruba should be relieved of any further obligations under the Diary Records Contract.

## FIFTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
### DIARY PUBLISHING AGREEMENT
**Against Diary Publishing, Diary Music Publishing, Inc., and David Taylor**

157. Plaintiffs incorporate the above paragraphs by reference, as though fully set forth herein.

158. By collecting royalties from third parties on behalf of Ms. Ruba, which the company was required to distribute to Ms. Ruba under the Diary Publishing Contract, the Diary Companies and Mr. Taylor acted as Ms. Ruba's fiduciary.

159. As fiduciaries, they were obligated to act in her best interest, and were prohibited from working against her interest without her knowledge or consent.

160. Defendants breached that fiduciary duty by collecting royalties meant for Ms. Ruba, and diverting them for personal interests and other purposes.

## SIXTH CAUSE OF ACTION

### BREACH OF IMPLIED COVENANT OF
### GOOD FAITH AND FAIR DEALING
### FAILURE TO USE BEST EFFORTS
### DIARY RECORDS AGREEMENT
**Against Diary Productions, Inc. f/k/a Diary Records, Inc. and David Taylor**

161. Plaintiffs incorporate the above paragraphs by reference, as though fully set forth herein.

18

162.   The Diary Records contract has an implied promise of good faith and fair dealing.

163.   Diary Records must not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

164.   The Diary Records Contract has an implied license to use best efforts to market, monetize, and exploit recorded performances by Ms. Ruba and projects featuring Ms. Ruba.

165.   Diary Records and Mr. Taylor were obligated to not take an unfair advantage of Ms. Ruba, and be faithful to their obligations under the contract.

166.   By not following through on their obligations to Island Records, these Defendants caused the termination of its contract to Island Records and with it, all opportunities for Ms. Ruba to receive the benefits of the Diary Record Contract.

167.   Additionally, these Defendants failed to use the money advanced by Island Records to develop and produce records by Ms. Ruba suitable for release.

168.   As a result, these Defendants breached their obligation of good faith and fair dealing, causing Ms. Ruba lost potential revenue and opportunities in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### UNJUST ENRICHMENT
**Against Diary Publishing, Diary Music Publishing, Inc., and David Taylor**

169.   Plaintiffs incorporate the above paragraphs by reference, as though fully set forth herein.

170.   By diverting and unduly retaining to themselves other compensation for Ms. Ruba's work, these Defendants were unjustly enriched to the detriment of Ms. Ruba.

171.   Equity and good conscience require that these Defendants be required to return to Ms. Ruba the sums they gained through their misconduct.

19

COMPLAINT

## EIGHTH CAUSE OF ACTION

### CONVERSION
**Against Diary Publishing, Diary Music Publishing, Inc., and David Taylor**

172.   Plaintiffs incorporate the above paragraphs by reference, as though fully set forth herein.

173.   Under the Diary Publishing Agreement, these Defendants owe a duty to Ms. Ruba to pay her publishing, performance royalties, sync royalties, mechanical royalties, and any other royalties for her compositions.

174.   These Defendants owe these sums of money to Ms. Ruba, which are contractually Ms. Ruba's property. These Defendants are wrongfully and intentionally depriving Ms. Ruba of her property.

175.   These Defendants diverted away from Ms. Ruba and given to themselves for their own personal benefit, Ms. Ruba's right to royalties and other compensation under the Diary Publishing Contract.

176.   Every time these Defendants receive and continue to receive royalties from third-party sources, without distributing that money directly to Ms. Ruba, these Defendants commit repeated acts of conversion.

177.   These acts of conversion are committed with malice and in conscious disregard of Ms. Ruba's rights, causing her to suffer consequential damages.

## NINTH CAUSE OF ACTION

### ACCOUNTING
**Against Diary Publishing, Diary Music Publishing, Inc., and David Taylor**

178.   Plaintiffs incorporate the above paragraphs by reference, as though fully set forth herein.

179.   These Defendants have a duty to account for the money owed to Ms. Ruba under the Diary Publishing Agreement, and to pay her according to the Agreement.

20

COMPLAINT

## TENTH CAUSE OF ACTION

### FRAUDULENT TRANSFER UNDER CALIFORNIA'S UNIFORM FRAUDULENT TRANSFER ACT, CALIFORNIA CIVIL CODE 3439
### Against David Taylor, Diary Publishing, and Diary Music Publishing, Inc.

180. Plaintiffs incorporate the above paragraphs by reference, as though fully set forth herein.

181. Ms. Ruba had a legitimate claim to payments under the Diary Publishing Contract, either from the company that entered into the contract or from Mr. Taylor.

182. Mr. Taylor, by himself and with Diary Music Publishing, Inc., collected royalties from multiple third parties to be distributed to Ms. Ruba under the Diary Publishing Contract.

183. However, Mr. Taylor used these royalties to pay numerous third parties, often for his personal benefit.

184. Each of these transactions were made despite Mr. Taylor's knowledge that the money was held for Ms. Ruba's benefit under the Diary Publishing Contract, and he was required to remit those payments to her.

185. Mr. Taylor made these transfers after the obligation to pay Ms. Ruba arose, with the intent to hinder, delay, and defraud Ms. Ruba.

### REQUEST FOR RELIEF

Plaintiff requests the following relief from the Defendants, jointly and severally:

a) Judgment in her favor for royalties owed to her under the Diary Publishing Agreement for an amount to be determined at trial, but no less than $200,000 for unpaid sync licenses, $15,500 for unpaid performance royalties, and an amount for unpaid mechanical royalties that cannot be estimated due to defendants' failure to provide an accounting,

b) Judgment in her favor for any monies owed to her under the Diary Records Agreement, for an amount to be determined at trial,

21

COMPLAINT

c)      Damages in lost profits and opportunities under the Diary Publishing Agreement, in amount to be determined at trial,

d)      Damages in lost profits and opportunities under the Diary Records Agreement, in amount to be determined at trial,

e)      Release from the Diary Publishing Agreement,

f)      Release from the Diary Records Agreement,

g)      The full return of Ms. Ruba's copyright interest in all compositions under the Diary Publishing Agreement.

h)      Judgment of piercing the corporate veil against Diary Publishing and Diary Music Publishing, such that David Taylor is personally liable all obligations to Plaintiff,

i)      Judgment of piercing the corporate veil against Diary Productions, Inc. f/k/a Diary Records, Inc., such that David Taylor is personally liable for all obligations to Plaintiff,

j)      Attachment against all bank accounts owned or operated by Defendants,

k)      Injunction prohibiting transfers of any kind from any bank account owned and operated by Defendants, except as to satisfy the monetary judgment against or as otherwise expressly permitted by the Court,

l)      Plaintiffs be awarded prejudgment and post-judgment interest,

m)      Reasonable attorney's fees and costs as permitted under the Diary Records Agreement,

n)      Reasonable attorney's fees and costs for all other causes of action,

o)      Such further relief as this Court deems just and equitable.


Date: November 16, 2022

By: _____

Mark Jaffe

5 Bridges Law, PC

Attorney for Plaintiff


22

COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury for all claims.

Date: November 16, 2022

By:

Mark Jaffe
5 Bridges Law, PC
Attorney for Plaintiff

COMPLAINT